ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| DynCorp International LLC | ) | ASBCA No. 61950 |
| | ) | |
| Under Contract No. W52P1J-07-D-0007 | ) | |

APPEARANCES FOR THE APPELLANT:     Holly A. Roth, Esq.
William T. Kirkwood, Esq.
Elizabeth Leavy, Esq.
  Reed Smith LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Arthur M. Taylor, Esq.
  DCMA Chief Trial Attorney
Srikanti Schaffner, Esq.
  Trial Attorney
  Defense Contract Management Agency
  Carson, CA

OPINION BY ADMINISTRATIVE JUDGE CLARKE

This case involves DynCorp International LLC's (DI) appeal of a Defense Contract Management Agency (DCMA) Contracting Officer's Final Decision implementing DCAA audits of cost reimbursement contracts and, in particular, the disallowance of severance payments made to DI's former CEO. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We deny DI's appeal. The parties have submitted the appeal for decision on the record, pursuant to our Board Rule 11, and only entitlement is before us.

FINDINGS OF FACT

(Each party relies exclusively on their joint Stipulation of Material Facts as their Proposed Finding of Facts. We adopt the parties' stipulated facts (stip.) and add additional facts as appropriate.)

1. Appellant is DynCorp International LLC (DI) (stip. ¶ 1).

2. Respondent is the Defense Contract Management Agency (DCMA) acting on behalf of those government agencies for which appellant performed cost type contracts during calendar year (CY) 2015 and CY2016 (stip. ¶ 2).

3. DI and the government are parties to numerous cost reimbursement contracts which are assigned for contract administration purposes to DCMA, including Contract No. W52P1J-07-D-0007 (Contract No. 0007) (stip. ¶ 3).

*Severance Payments to DI CEO Mr. Gaffney*

4. From August 25, 2010 to July 10, 2014, DI employed Steven F. Gaffney as its Chief Executive Officer (CEO). Mr. Gaffney's terms of employment with DI were subject to a 2010 Employment Agreement. Mr. Gaffney's employment with DI was terminated on July 10, 2014. In accordance with the 2010 Employment Agreement and 2014 Separation Agreement between Mr. Gaffney and DI, following Mr. Gaffney's termination, DI agreed to pay severance to Mr. Gaffney in the aggregated amount of $9.2 million (less applicable tax withholdings). The severance amount was calculated in accordance with the 2010 Employment Agreement, which stated that the severance payment would be "equal to two (2) times the sum of the Base Salary and Bonus at Target." (Stip. ¶ 4; R4, tab 5 at 2)[1]

5. As required by the 2010 Employment Agreement and 2014 Separation Agreement, DI made severance payments to Mr. Gaffney in 2014, 2015 and 2016 (stip. ¶ 5; R4, tab 5 at 2).

*2015 & 2016 Incurred Cost Proposals*

6. In accordance with Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST AND PAYMENT, DI submitted its CY2015 incurred cost proposal (2015 ICP) to the DCMA on June 30, 2016, to establish DI's final indirect cost rates for January 1 through December 31, 2015. DI's 2015 ICP included costs DI incurred relative to DI's severance payments to Mr. Gaffney in DI's G&A expense pool. (Stip. ¶ 6; R4, tab 2)

7. On June 21, 2017, DI submitted its CY2016 incurred cost proposal (2016 ICP) to the DCMA to establish DI's final indirect cost rates for January 1 through December 31, 2016. DI's 2016 ICP included costs DI incurred relative to DI's severance payments to Mr. Gaffney in DI's G&A expense pool. (Stip. ¶ 7; R4, tab 3)

*DCAA Audit Report*

8. On June 26, 2018, the Defense Contract Audit Agency (DCAA) issued Audit Report Nos. 3181-2015D10100001 and 3181-2016D1010001 (the "Audit Reports") on DI's proposed amounts on unsettled flexibly priced contracts for CY2015 and CY2016 (stip. ¶ 8). In particular, and with respect to the instant appeal and DI's

---

[1] The page numbers we cite are PDF page numbers for ease of locating.

2

incurred costs relative to the severance payments at issue, the DCAA audit reports included the following:

> 5. Indirect Costs
>
> > a. Summary of Conclusions:
> >
> > We questioned $7,812,098 ($4,745,431 + $3,066,667) of proposed indirect severance costs *based on FAR 31.201-3, Determining Reasonableness. . . .*

(R4, tab 4 at 19)  (Emphasis added)

> 9.  DCAA commented on severance pay:
>
> > (1) Severance
> >
> > > (Table omitted, *see* R4, tab 4 at 20)
> >
> > > We observed a large amount of severance costs while performing data analytics on indirect costs. Subsequently, we found DI's former Chief Executive Officer (CEO), received severance of $4,983,333 in CY 2015 and $3,066,667 in CY 2016, totaling $8,050,000 for both years.
> >
> > > We requested DI to provide support demonstrating these severance costs were allowable and reasonable.  In response, DI provided the former CEO's employment agreement and separation agreement.
> >
> > > • Employment Agreement.  The employment agreement was effective August 25, 2010 for four years.  The agreement stated if the employee was terminated by the company without cause or due to the company's non-renewal of the term he would be entitled to "...*a severance payment equal to two (2) times the sum of Base Salary and Bonus at Target, payable in twenty-four (24) equal monthly installments....*"  The agreement also defined the annual base salary as $2,000,000 and the target bonus as 130 percent of base salary ($2,600,000).

• Separation Agreement. The separation agreement was effective July 10, 2014. The agreement stated the separation from DI would be treated as a termination without cause; therefore, the employee would be entitled to severance payments as defined in the employment agreement.

> *We reviewed employment agreements for other former CEOs at DI and CEOs of similar defense contractors and found the severance terms of twice a CEO's salary plus bonus to be reasonable in comparison.*

(R4, tab 4 at 20-21) (Emphasis added)

10. DCAA commented on reasonableness:

> Nevertheless, FAR 31.201-3(b) states in part: "What is reasonable depends upon a variety of considerations and circumstances, including --... (3) The contractor's responsibilities to the Government ...." In our opinion, the annual compensation used in the calculation should be subject to the limit discussed in FAR 31.205-6, Compensation. FAR 31.205-6(p)(1)(i) defines compensation as, in part: "...the total amount of wages, salary, bonuses ...." Although *the severance payments do not meet the definition of compensation*, the salary and bonus components of the severance calculations do meet this definition. Therefore, in our opinion, the FAR 31.205-6(p) limitation on allowability of compensation is an appropriate benchmark to determine reasonableness of the salary and bonus components. *Consequently, in our opinion, the salary and bonus portion of the severance payment calculation in excess of the limit in FAR 31.205-6(p)(1)(i) is unreasonable.*
>
> To determine the maximum allowable severance, we doubled the FAR 31.205-6(p)(2)(i) *compensation limitation amount of $693,951 in effect when the employee was hired for this position (CY 2010).* We subtracted that amount from the total severance proposed and paid to determine the total unallowable severance amount of $7,812,098. Our calculation of this amount is shown in the table below.

Total Unallowable Indirect Severance former CEO

| Description | Amount |
|---|---|
| Severance Proposed and Paid | |
| CY 2014 | $1,150,000 |
| CY 2015 | 4,983,333 |
| CY 2016 | 3,066,667 |
| Total Severance Proposed and Paid | $9,200,000 |
| Less Maximum Allowable Severance * | 1,387,902 |
| Total Unallowable Severance | $7,812,098 |

* Maximum Allowable Severance = $693,951 x 2 [= $1,387,902]

(R4, tab 4 at 21)  (Emphasis added)

11. DCAA's CY2014 audit did not challenge DI's severance costs:

> DI's CY 2014 severance costs of $1,150,000 were not included in the scope of this audit as our office examined and reported on those costs in DCAA Audit Report No. 031812013D10100001, dated January 2, 2018. *In that audit, we did not specifically examine severance costs.* Therefore, the costs were not questioned or a subject of discussion when the *CY 2014 ICP was negotiated and settled on March 2, 2018.* As a result, these costs have been recovered by DI in the CY 2014 ICP.

> We determined $237,902 as the remaining portion of the allowable severance costs, after consideration of the already recovered severance costs in CY 2014 of $1,150,000 ($1,387,902 - $1,150,000 = $237,902). We questioned the difference between the proposed and paid severance in CY 2015 and the allowable severance costs ($4,983,333 - $237,902 = $4,745,431). We questioned all of the proposed and paid severance costs in CY 2016 because the contractor recovered all of the allowable severance costs ($1,387,902) in CYs 2014 & 2015.

> Unallowable severance questioned by CY is shown in the table below.

DynCorp International LLC

Questioned CYs 2015 and 2016 Indirect Severance for Former CEO

| Severance Proposed and Paid | | Questioned |
|---|---|---|
| CY 2014 | $1,150,000 | $ |
| CY 2015 | 4,983,333 | 4,745,431 |
| CY 2016 | 3,066,667 | 3,066,667 |
| Total | $9,200,000 | $7,812,098 |

(R4, tab 4 at 22)  (Emphasis added)

12.  DI disagreed with the DCAA audit:

d. Contractor's Reaction:

(1)    Severance

DI did not concur with the questioned indirect severance.  DI disagreed with our use of the FAR 31.205-6(p)(2)(i) compensation limitation in effect when the employee was hired (CY 2010).  DI was confused by our inclusion of the severance amounts paid in CY 2014 to its former CEO in our calculations of unallowable severance.  DI stated that severance pay is not subject to the compensation limits discussed in FAR 3l.205-6(p) and must be evaluated separately for reasonableness.  DI disagreed that the questioned severance costs are unreasonable based on FAR 31.201-3.  DI noted its Compensation Director and an executive compensation consulting firm both opined that DI was well within standard industry practices regarding the payment of these severance costs.  Refer to Appendix 4 for the full text of the contractor's reaction to questioned indirect severance.

(R4, tab 4 at 26)

*Statutory Cap*

13.  The statutory cap on compensation increased every year:

| Statutory Cap | Fiscal Year | Costs Incurred After |
|---|---|---|
| $1,144,888 | 2014 | Jan 1, 2014 |
| $980,796 | 2013 | Jan 1, 2013 |
| $952,308 | 2012 | Jan 1, 2012 |
| $763,029 | 2011 | Jan 1, 2011 |
| $693,951 | 2010 | Jan 1, 2010 |

https://www.whitehouse.gov/wp-content/uploads/2017/11/ContractorCompensationCapContractsAwardedBeforeJune24.pdf

14.  On January 7, 2019, DCMA's Corporate Administrative Contracting Officer (CACO) John R. Branch issued a Contracting Officer's Final Decision (COFD), which disallowed $4,986,523 from DI's FY 2015 G&A Pool and $2,376,450 from DI's FY 2016 G&A Pool and unilaterally established DI's final indirect cost rates for CY2015 and CY2016 based, in part, on the disallowed severance costs incurred by DI (stip. ¶ 10).

15.  As is pertinent to this appeal, the COFD advised DI that the CACO had determined that $6,029,210 of the severance DI paid to DI's former CEO for CY2015 and CY2016 is unallowable.  In particular, the COFD advised DI that the amount CACO had determined to be unallowable was $3,951,448 in CY2015 and $2,077,762 in CY2016.  (Stip. ¶ 11)

16.  The COFD advised DI that the CACO's determination was based on the CACO's assertion that "[s]everance pay is compensation subject to the ceilings set forth in FAR 31.205-6(p) for each applicable calendar year" and that the severance amounts paid to DI's CEO for CY2015 and CY2016 that exceed the statutory compensation limits under FAR 31.205-6(p) are unallowable (stip. ¶ 12).

17.  The COFD also stated that, in the alternative to severance pay being compensation subject to FAR 31.205-6(p), severance pay DI paid to its former CEO is a directly associated cost under FAR 31.201-6(d) to the extent that it would not have been incurred but for the underlying unallowable salary cost (stip. ¶ 13).

18.  The COFD unilaterally adjusted for the disallowed executive severance pay and unilaterally established the final indirect rates for DI's fiscal years ended in December 31, 2015 and December 31, 2016 (stip. ¶ 14).

19. DI filed its notice of appeal of the COFD on January 22, 2019 (stip. ¶ 15).

20. DI filed its Complaint on February 25, 2019 and limited the scope of its appeal to the COFD's disallowance of DI's severance payments to DI's former CEO, Mr. Gaffney (stip. ¶ 16).

DECISION

*Jurisdiction*

The COFD involves both entitlement to reductions in severance pay and calculation of the deductions. In this appeal, however, the DI focuses on the right to a deduction, not the calculation of the deduction. We deny DI's appeal but only as to the government's right to deductions in severance pay, not the amounts of the deductions. Though, DI raises reasonable concerns in its claim over how the deductions were calculated by DCAA (and they appear to remain to be negotiated), that issue is not before us today.

*Standard of Review*

Both parties rely exclusively on the facts included in their joint stipulation. We agree that there are no disputed material facts. Therefore this appeal is appropriate for resolution on the record pursuant to our Rule 11 submitted without a hearing.[2]

We are presented with issues of contract/regulatory interpretation. Both parties agree that the FAR provisions involved should first and foremost be interpreted based on the "plain language" of the regulation (app. mot. at 7-8; gov't mot. at 2). We agree. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (We enforce the "plain and ordinary" meaning of language that is clear and unambiguous.) We need not conduct an exhaustive analysis of the law of regulatory interpretation because this case is resolved on the "plain language" standard upon which the parties and the Board agree.

---

[2] The parties style their motions as "on the administrative record" not as motions for summary judgement or proceedings under Board Rule 11. In the end given the purely legal nature of the dispute before us and the stipulations of fact upon which the decision rests, the results of this appeal are no different than if we had treated the motions as motions for summary judgment instead of Rule 11 submissions.

*Positions of the Parties*

In its July 22, 2019 Motion, DI organizes its argument into six questions of law (app. mot. at 6-7). The highpoints of DI's argument are as follows: (1) DI states that "neither the audits conducted by the Defense Contract Audit Agency (DCAA) nor the COFD, determined that DI's severance payments made for CY2015 and CY2016 were unallowable under FAR 31.205-6(g) [Severance pay]" (app. mot. at 9-10). DI also points out that DCAA found that DI's severance pay was reasonable, "[i]n fact, the DCAA determined that DI's severance payments for CY2015 and CY2016 were 'reasonable'" (app. mot. at 10). (2) DI quotes the definition of compensation in FAR 31.205-6(p) and argues, "[t]his definition does not include the term 'severance pay,' nor does it reference FAR 31.205-6(g)" (app. mot. at 11). Therefore, DI argues that the government's characterization of severance pay as compensation was wrong. Based on all this DI urges the Board to conclude that severance pay, "does not fall within FAR 31.205-6(p)'s limitations on the allowability of 'compensation'" (app. mot. at 12). (3) Next DI argues that severance pay cannot be an unallowable "directly associated cost" under FAR 31.201-6(d) because the severance pay was allowable and, "because it was not incurred by DI as a result of, nor related to, any other cost DI incurred in CY2015 and CY2016" (app. mot. at 13). (4) In its Reply Brief DI reiterates that, "[i]n fact, DCAA also determined the severance payments to be reasonable" (app. reply br. at 3). (5) DI argues the government's argument that severance pay is somehow "salary" or "wages" "contradicts the plain language of FAR 31.205- 6(g) and the common meaning of its words" (app. reply br. at 4). DI dismisses the government's reliance on Armed Services Procurement Regulations (ASPR) cases and Black's Law Dictionary (app. reply br. at 5-6). DI argues that the Employee Compensation Cap cannot reasonably be interpreted to apply to severance payments (app. reply br. at 7). (6) Finally, DI reiterates its argument that severance payments are not "directly associated costs" because "these severance payments were neither incurred by DI as a result of, nor related to, any costs DI incurred that were subject to the Employee Compensation Cap's 2015 and 2016 ceilings" (app. reply br. at 8).

In its August 22, 2019 Cross-Motion and Opposition, DCMA first deals with the idea that severance pay is compensation. DCMA states that DI, "fails to cite any legal authority for its position that severance pay is not a type of 'wages' or 'salary.'" DCMA argues, "the notion that severance pay is a type of 'wages' or 'salary' is supported by the plain language of FAR 31.205-6(g)." DCMA focuses on the definition of severance pay in FAR 31.205-6(g), "[s]everance pay is a payment *in addition to regular salaries and wages* by contractors to workers whose employment is being involuntarily terminated." (Emphasis added by DCMA) (Gov't cross-mot. at 2) Citing Black's Law Dictionary's definitions of "regular," "salary" and "wages," DCMA argues, "[s]everance pay is clearly a reward or recompense for services performed, as the right to severance pay is earned only after performing personal services for the employer, and therefore falls within the definition of 'salary'" (gov't cross-mot. at 3).

9

DCMA relies heavily on its assertion "DynCorp asks the Board to ignore the word 'regular' in the definition of severance pay" which "alters the plain meaning of FAR 31.205-6(g)" to exclude severance pay from wages and salary. DCMA sums up with, "the plain meaning of FAR 31.205-6(g), after giving meaning to the word 'regular,' indicates that severance pay is a type of salary and wages, just not the usual or customary type of salary and wages." (*Id.*) DCMA points out that the ASPR, a precursor to the FAR, referred to severance pay as "dismissal wages" (gov't cross-mot. at 4). Next, DCMA argues, "the severance pay that DynCorp paid to its former Chief Executive Officer (CEO) is a directly associated cost under FAR 31.201-6(d) to the extent that it would not have been incurred but for the underlying overceiling salary cost" (gov't cross-mot. at 5). DCMA contends, "[t]he CACO determined that any compensation exceeding that cap is unallowable. . . . Therefore, the amount of severance pay associated with the unallowable compensation is also unallowable" (gov't cross-mot. at 6). In its Sur-Reply DCMA argues, "DynCorp may not circumvent FAR 31.205-6(p)'s compensation cap by drafting employment agreements that promise to pay severance costs that exceed the benchmark compensation amount" (gov't sur-reply at 2). DCMA reiterates its argument that the definition of "compensation for personal services" in FAR 31.001 when read with FAR 31.205-6(a) and FAR 31.205-6(g), supports the conclusion that severance payments are compensation (gov't sur-reply at 2). DCMA returns to its argument about the word "regular" stating, "[a]ppellant's interpretation of severance pay renders meaningless the word 'regular' in the definition" (gov't sur-reply at 3). DCMA argues the reference to "dismissal wages" in the ASPR is "entitled to deference because it provides additional evidence of the promulgator's intent, and demonstrates that the promulgators of the regulatory cap intended for severance costs to be subject to the cap" (gov't sur-reply at 4). Both parties suggest that Black's Law Dictionary supports their position. DCMA counters that "DynCorp's reliance on Black's Law Dictionary is irrelevant since severance pay is expressly defined under FAR 31.205-6(g)" (gov't sur-reply at 5). Concerning the matter of directly associated costs, DCMA argues, "[i]f Mr. Gaffney's FY 2014 base salary did not exceed the compensation cap, his annual severance pay would not have exceeded the compensation cap either" (gov't sur-reply at 7).

*CEO Gaffney's Base Salary Exceeded the Statutory Cap Every Year*

DI's employment agreement with CEO Gaffney, effective August 25, 2010 for four years, provided for a base salary of $2,000,000 and the target bonus of 130 percent of base salary ($2,600,000) (finding 9). The statutory cap on compensation for that four years ranged from $693,951 in 2010 to $1,144,888 in 2014 (finding 13). CEO Gaffney's base salary of $2,000,000 exceeded the statutory cap all four years.[3]

---

[3] The record does not include the audit reports for CY2010 through CY2014 so we do not know if DCAA disallowed DI's salary and bonus payments to CEO Gaffney that exceed the statutory cap as we would expect.

*DCAA's Audit Comment that the "Severance Terms" were Reasonable Does not Refer to the Amounts*

We now turn to DI's arguments as presented in its brief. Its first argument, that the DCAA considered the severance pay to be reasonable and payable, is based upon a misreading of the relevant language in DCAA's audit report. DCAA included the following finding in the audit report:

> We reviewed employment agreements for other former CEOs at DI and CEOs of similar defense contractors and found the severance terms of twice a CEO's salary plus bonus to be reasonable in comparison.

(Finding 9) DI interprets this to mean that the severance payment "amounts" are reasonable. We do not agree. DCAA simply found that "severance terms of twice a CEO's salary plus bonus to be reasonable." The word "terms" cannot reasonably be interpreted to refer to the dollar amount of the severance paid to former CEO Gaffney. We interpret the language as DCAA finding the mechanism of calculating the severance pay reasonable. DCAA did not find the $9,200,000 (finding 11) in severance payments to CEO Gaffney reasonable and made that clear in the audit, "We questioned $7,812,098 ($4,745,431 + $3,066,667) of proposed indirect severance costs based on FAR 31.201-3, Determining Reasonableness. . . ." (Finding 8)

*Severance Payments are not Compensation*

DI's next argument, that severance payments are not "compensation" under the FAR, fares better.

> We start with the FAR definition of compensation:
>
> ### 31.001 Definitions.
>
> "Compensation for personal services" means all remuneration paid currently or accrued, in whatever form and whether paid immediately or deferred, for services rendered by employees to the contractor.

There is an additional definition of compensation in FAR 31.205-6(p):

> (p) *Limitation on allowability of compensation.*
>
> . . . .

11

> (1) *Definitions*. As used in this paragraph (p)-
>
> (i) "Compensation" means the total amount of wages, salary, bonuses, deferred compensation (see paragraph (k) of this subsection), and employer contributions to defined contribution pension plans (see paragraphs (j)(4) and (q) of this subsection), for the fiscal year, whether paid, earned, or otherwise accruing, as recorded in the contractor's cost accounting records for the fiscal year.

From these definitions we understand that compensation (under the FAR cost allowability definition) is "for services rendered" for "the fiscal year" that are "recorded in the contractor's cost accounting records for the fiscal year." CEO Gaffney's severance payments cannot be for "services rendered" in fiscal years after his employment has been terminated. DCAA agrees with this interpretation, "[a]lthough the severance payments do not meet the definition of compensation . . . ." (Finding 10) We find DCMA's reliance on the word "regular" in FAR 31.205-6(g) and its argument that severance pay is a "type of salary and wages, just not the usual or customary type of salary and wages" unpersuasive. Severance pay is not compensation.

*The Challenged Severance Payments are not Reasonable*[4]

We start with the fact that DCAA questioned DI's severance costs based on reasonableness:

> We questioned $7,812,098 ($4,745,431 + $3,066,667) of proposed indirect severance costs *based on FAR 31.201-3, Determining Reasonableness. . . .*

(Finding 8) (Emphasis added) Also:

> Consequently, in our opinion, the salary and bonus portion of the severance payment calculation in excess of the limit in FAR 31.205-6(p)(1)(i) is *unreasonable*.

(Finding 10) (Emphasis added)

---

[4] We need not consider "directly associated cost" because our decision is based on reasonableness.

In order for a cost to be allowable it must meet certain requirements. FAR 31.201-2, DETERMINING ALLOWABILITY, lists the five requirements including reasonableness. We assess reasonableness under the guidance of FAR 31.201-3, DETERMINING REASONABLENESS, which provides:

### 31.201-3 Determining reasonableness.

(a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. *No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.*

(b) What is reasonable depends upon a variety of considerations and circumstances, including-

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) *The contractor's responsibilities to the Government*, other customers, the owners of the business, employees, *and the public at large*; and

(4) Any significant deviations from the contractor's established practices.

(Emphasis added) Focusing on FAR 31.201-3(a) we find that the DCAA audit constitutes an "initial review of the facts" that resulted in "a challenge of a specific cost by the contracting officer" that shifts the burden of proof to DI (findings 8, 14). Therefore, DI has the burden of proving that its severance payments are reasonable. We dealt with DI's primary argument for reasonableness when we rejected DI's

13

interpretation of DCAA's statement that it "found the severance terms of twice a CEO's salary plus bonus to be reasonable" to mean DCAA agreed the severance payment amounts were reasonable.  As we explained above DCAA did not find that the dollar amounts of severance payments were reasonable.

FAR 31.205-6, COMPENSATION FOR PERSONAL SERVICES, subparagraph (p) Limitation on allowability of compensation, imposes statutory caps on compensation.  In CY2010 the following limitation applied:

> (ii) Costs incurred after January 1, 1998, for the compensation of a senior executive in excess of the benchmark compensation amount determined applicable for the contractor fiscal year by the Administrator, Office of Federal Procurement Policy (OFPP), under 41 U.S.C. 1127 as in effect prior to June 24, 2014, are unallowable (10 U.S.C. 2324(e)(1)(P) and 41 U.S.C. 4304(a)(16), as in effect prior to June 24, 2014).

FAR 31.205-6(p)(2).  Similar cap language applies after June 24, 2014. FAR 31.205-6(p)(3)&(4).  DCAA found that these caps did not apply to severance pay but did apply to DI's CEO's salary and bonus:

> Although the severance payments do not meet the definition of compensation, the salary and bonus components of the severance calculations do meet this definition.  Therefore, in our opinion, the FAR 31.205-6(p) limitation on allowability of compensation is an appropriate benchmark to determine reasonableness of the salary and bonus components.

(Finding 10)  We agree.  DCAA relied on the "responsibilities to the Government" element of reasonableness:

> Nevertheless, FAR 31.201-3(b) states in part:

> "What is reasonable depends upon a variety of considerations and circumstances, including --... (3) The contractor's responsibilities to the Government ...."  In our opinion, the annual compensation used in the calculation

14

should be subject to the limit discussed in FAR 31.205-6, Compensation.

(Finding 10) We agree. The statutory caps establish "The contractor's responsibilities to the Government . . . and the public at large." That is the responsibility not to claim salary costs over the statutory limit.[5] These are two of the itemized "considerations and circumstances" in FAR 31.201-3 supporting reasonableness. The statutory cap ranged from $693,951 in 2010 to $1,144,888 in 2014. DI's CEO's base salary of $2,000,000 exceeded these caps every year of CEO Gaffney's employment. (Findings 13, 9) DI's severance payments were calculated as two times the sum of base salary and bonus (finding 9-10). Therefore, DI's severance payments were calculated in part using salary and bonus amounts that exceeded the statutory caps. We find that the portion of the severance payments derived from unallowable salary and bonus amounts above the statutory caps are likewise unallowable. This conclusion is just common sense, there is nothing magic about a severance pay calculation that converts unallowable salary into allowable severance payments. Interestingly, DCMA seems to have recognized this argument among the many arguments both parties made:

> DynCorp may not circumvent FAR 31.205-6(p)'s compensation cap by drafting employment agreements that promise to pay severance costs that exceed the benchmark compensation amount.

(Gov't sur-reply at 2) Bottom line: unallowable salary cost used in a severance pay calculation results in unallowable severance costs – unallowable in, unallowable out. We deny DI's appeal.

<u>CONCLUSION</u>

Based on the above we deny the appeal.

Dated: September 29, 2020

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[5] We use the word "claim" not "pay." DI is free to pay its CEO whatever it wants but just cannot ask the government to pay more than the cap.

I concur                                          I concur


RICHARD SHACKLEFORD                              J. REID PROUTY
Administrative Judge                             Administrative Judge
Acting Chairman                                  Vice Chairman
Armed Services Board                             Armed Services Board
of Contract Appeals                              of Contract Appeals


I certify that the foregoing is a true copy of the Order of Dismissal of the Armed Services Board of Contract Appeals in ASBCA No. 61950, Appeal of DynCorp International LLC, rendered in conformance with the Board's Charter.

Dated: September 29, 2020


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals